William G. Dryden
Joseph N. Pirtle
Craig R. Yabui
ELAM & BURKE, P.A.
251 E. Front St., Ste. 300
P.O. Box 1539
Boise, Idaho 83701
Telephone: (208) 343-5454
Facsimile: (208) 384-5844
wgd@elamburke.com
jnp@elamburke.com
cry@elamburke.com
Dryden – ISB #2395
Pirtle – ISB #6973
Yabui – ISB #7706

Attorneys for JH Kelly, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JH KELLY, LLC, a Washington limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>TIANWEI NEW ENERGY HOLDINGS CO., LTD., a People's Republic of China company, TAO (MIKE) ZHANG, WEI XIA, SCOTT PAUL, DAYI (SEAN) LIU, AND DOES 1-10,<br><br>Defendants. | CASE NO. 4:13-cv-00368-BLW<br><br>RESPONSE TO DEFENDANT SCOTT PAUL'S MOTION TO DISMISS AMENDED COMPLAINT (Doc. 39) |

Plaintiff JH Kelly, LLC, by and through its counsel of record, Elam & Burke, P.A., files this Response to Defendant Scott Paul's Motion to Dismiss the Amended Complaint (Doc. 39). Paul's Motion to Dismiss should be denied because JH Kelly's fraud and racketeering claims are pled with particularity and because the Amended Complaint states a valid negligence claim

RESPONSE TO DEFENDANT SCOTT PAUL'S MOTION TO DISMISS AMENDED COMPLAINT – 1

against Paul and the other Defendants based upon the "special relationship" exception to the economic loss rule.

## ARGUMENT

Mr. Paul continues to mischaracterize the Amended Complaint as alleging false <u>promises of payment in the future</u>. However, both the Complaint and the Amended Complaint allege false statements by Paul and the other Defendants of <u>committed financing being in place sufficient to complete construction of the Project</u>. In its simplest terms, this case is about representations that they "had the money." It is not a case about a "promise to pay money." Mr. Paul's and the other Defendants' misrepresentations induced JH Kelly to take a specific course of action which, in turn, caused JH Kelly to sustain damages. Mr. Paul's and the other Defendants' statements about having the money were false because no committed financing was in place at the time the statements were made and they knew that fact when their representations were made. Mr. Paul's arguments based on Tianwei's alleged intent to pay JH Kelly in the future are irrelevant because those arguments misstate the allegations in the Amended Complaint.

### I.  JH KELLY HAS SUFFICIENTLY PLED ITS CLAIMS FOR FRAUD AND STATE AND FEDERAL RICO VIOLATIONS

Mr. Paul argues that JH Kelly's fraud and state and federal racketeering claims fail to comply with state or federal rules requiring that fraud allegations, including federal RICO claims, be pled with particularity. To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiff pleads sufficient facts to allow for the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. Plausibility is not akin to a "probability requirement," but it does require more than a sheer possibility that a defendant has acted unlawfully. *Id.*

RESPONSE TO DEFENDANT SCOTT PAUL'S MOTION TO DISMISS AMENDED COMPLAINT – 2

"Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009).

A dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *Krainski v. Nevada ex rel. Bd. of Regents*, 616 F.3d 963, 972 (9th Cir. 2010). The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading is made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). The issue is not whether the plaintiff will prevail but whether it "is entitled to offer evidence to support the claims." *Diaz v. Int'l Longshore and Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2008) (citations omitted).

Mr. Paul's Motion to Dismiss JH Kelly's fraud and racketeering claims is governed by Rule 9(b), which provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

> Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to <u>give defendants notice of the particular misconduct</u> … so that they can defend against the charge and not just deny that they have done anything wrong. <u>Averments of fraud must be accompanied by "the who, what, when, where, and how" of the misconduct charged</u>. A party alleging fraud must set forth more than the neutral facts necessary to identify the transaction.

*Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124-25 (9th Cir. 2009) (emphasis added).

No reasonable claim can be made that the Amended Complaint fails to apprise Mr. Paul of the specific fraud allegations made against him, including allegations of falsity and

knowledge. The Amended Complaint pleads fraud and racketeering claims with particularity, and Mr. Paul's Motion to Dismiss under Rule 12(b)(6) should be denied.

### A.  JH Kelly Has Sufficiently Pled its Fraud Claim

"In Idaho, fraud consists of (1) a statement or a representation of fact, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity, (5) the speaker's intent that there be reliance, (6) the hearer's ignorance of the falsity of the statement, (7) reliance by the hearer, (8) justifiable reliance, and (9) resultant injury." *Washington Federal Sav. v. Van Engelen*, 153 Idaho 648, 657, 289 P.3d 20, 29 (2012). Other than the requirements that the defendant must knowingly make a false statement, there is no specific "scienter" requirement for fraud in Idaho. *See Staff of Idaho Real Estate Comm'n. v. Nordling*, 135 Idaho 630, 635, 22 P.3d 105, 110 (2001).

The Amended Complaint alleges several false statements by Defendants representing that funds were in place to induce JH Kelly to continue its work on the Project. (Doc. 35, ¶¶ 35-39, 42-44).

> "On multiple occasions during 2011, Mr. Zhang and Mr. Paul acknowledged the delinquent payments and stated to JH Kelly that Tianwei then had in place all required financing required for completion of the Project, and that it was strictly a matter of 'when, not if,' the flow of U.S. funds would be cleared from the appropriate bureaucrats in China." (Doc. 35, ¶ 35).

> "On or about November 2, 2011, Mr. Liu represented in correspondence to Randy Peck of JH Kelly that he had just checked and the money was then in place to pay JH Kelly, but they still needed some time to move 'the money from China to the States.'" (*Id.*, ¶ 36).

> "On November 2, 2011, Mike Zhang and Randy Peck (Project Manager for JH Kelly) had a lunch meeting in Pocatello, Idaho. In a follow-up email dated November 3, 2011, Mr. Zhang represented that 'Hoku has enough budget to complete the current contracts.'" (*Id.*, ¶ 37).

> "After a follow-up email to Mr. Liu on November 7, 2011 regarding the failure of Hoku Materials to make payment, Mr. Liu responded that he was 'working with

Mr. Xia' to get his signature, which would allow payment to be made. Mr. Liu regularly represented to JH Kelly that all fund disbursements had been approved and secured by Mr. Xia and Tianwei's bank affiliates, and that delays were solely attributable to wire logistics, various cultural festivals and holidays and 'other strictly procedural' matters. . . . In addition, on several occasions, Mr. Xia attended meetings with JH Kelly in Pocatello, Idaho, and made assurances that he fully supported the Project and that the funding was already in place to pay for JH Kelly's work." (*Id.*, ¶ 38).

"Still with no payment, on November 17, 2011, Scott Paul represented to Terry Major of JH Kelly in an email that releasing funds to JH Kelly was 'complicated' because Chinese banks only have limited windows of times to provide funding to U.S. ventures and that, by the end of the year, most of the funds are already allocated. Mr. Paul also said in an email that 'Hoku/Tianwei is not a credit risk. There is just a timing issue.'" (*Id.*, ¶ 39).

"Continuing the fraud, on November 23, 2011, Mr. Paul sent a follow-up email to JH Kelly in which he informed JH Kelly that 'we're good for the money. Tianwei has committed to provide the funding we need to build this plant.' Mr. Paul's representation reiterated a prior representation made to JH Kelly executives by Mr. Xia that Tianwei 'will ensure that sufficient funds are in place till completion of the project.'" (*Id.*, ¶ 42).

"Mr. Zhang arranged a November 23, 2011 meeting with Terry Major of JH Kelly in Pocatello, Idaho where Mr. Zhang acknowledged the failure to pay JH Kelly, asked JH Kelly to continue working on the Project, and reiterated the position espoused by Mr. Paul and other representatives of Hoku Materials/Tianwei, *i.e.*, the funds necessary to complete the Project had already been secured and the only problem was a timing issue in transferring the money from China to the United States. In a follow-up email, Mr. Zhang reiterated, 'Dear Terry, Just like the same thing happened at the end of last year, Hoku experiences difficulty to transfer money from China to the States due to Chinese bank quota issue. But we expect things will be much better after Chinese New Year (01/23/2012) holiday.'" (*Id.*, ¶ 43).

"On December 2, 2011, Tianwei increased the pressure on JH Kelly to stay on the project. Mr. Zhang informed Mr. Peck and Major that Tianwei remained committed with full financial support to the Project." (*Id.*, ¶ 44).

JH Kelly alleges that Mr. Paul's and the other Defendants' statements were false because, in particular, (i) Tianwei did not have in place committed financing sufficient to complete the Project; (ii) Hoku Corporation's and Hoku Materials' internal financial documents demonstrated that no such financing existed; (iii) there were no agreements in place with financiers, including

Tianwei, demonstrating the existence of any committed financing sufficient to complete the Project; (iv) the correspondence from Hoku Corporation's project manager, Joe Smith, on March 19, 2012, where he asked for "patience as we continue to work toward securing the funds needed to pay each contractor the full amount due for work completed," demonstrated that it was not a matter of Defendants changing their mind about paying JH Kelly; and (v) no additional payments were made to JH Kelly after October 2011. (Doc. 35, ¶¶ 50 and 47).

The Amended Complaint also alleges that Defendants, including Paul, knew the financing was not in place at the time the statements were made. (*Id*., ¶¶ 51-52). Defendants Xia, Zhang and Paul knew as of May 19, 2011, that Hoku Materials needed an estimated $199 million in new debt financing for capital expenditures during its fiscal year 2012. (*Id*., ¶ 28). For June 2011 through December 2011 alone, they knew they needed $168 million in funding for construction costs. (*Id*., ¶ 31). As of September 30, 2011, Hoku Corporation only had $949,686.98 in cash remaining from what it had borrowed for the Project. (Doc. 35, ¶ 34). As of December 31, 2011, Hoku Corporation had only $822,218.46. (*Id*., ¶ 45). Based on Hoku Corporation's Form 10-Q for the period ending December 31, 2011, no credit agreements or other new debt financing sufficient to cover construction costs were secured between June 2011 and December 2011. (Doc. 19-4, pp. 17-24).[1]

At this stage, the issue is not whether JH Kelly will prevail but whether it is "entitled to offer evidence to support [its] claims." *Diaz v. Int'l Longshore and Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007). The Amended Complaint pleads facts supporting a claim

---

[1] This Court may take judicial notice of public documents that are required to be filed and are actually filed with the Securities and Exchange Commission when deciding a motion to dismiss, even if the filings are not cited in the complaint. *In re Atlas Mining Company, Securities Litigation*, 670 F.Supp.2d 1128, 1139 (D. Idaho 2009) citing *Dreiling v. American Express. Co.*, 458 F.3d 942, 946 n. 2 (9th Cir. 2006).

RESPONSE TO DEFENDANT SCOTT PAUL'S MOTION TO DISMISS AMENDED COMPLAINT – 6

for fraud that is plausible on its face. The Amended Complaint also complies with the heightened pleading requirements of Rule 9(b), as it describes in detail the fraudulent statements and specifically states the "who, what, when, where, and how" of the alleged misconduct.

### B. JH Kelly Has Sufficiently Pled State and Federal RICO Claims

#### 1. JH Kelly Has Sufficiently Pled an Enterprise

Mr. Paul argues that the Amended Complaint insufficiently alleges a RICO enterprise. A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To establish RICO liability "one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S.Ct. 2087, 2090 (2001) (citation omitted). Mr. Paul argues that because he and the other Defendants are all part of the same corporate family they cannot combine to form a RICO enterprise. That argument is directly contrary to the holding in *King*.

In *King*, the Court held that a corporate employee and the corporation are sufficiently distinct and can therefore form a RICO enterprise. Specifically, the Court held that a "corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." *Id*. at 163, 121 S.Ct. at 2091.

> Linguistically speaking, an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any "person" unlawfully to conduct an "enterprise," particularly when the statute explicitly defines "person" to include "any individual ... capable of holding a legal or beneficial interest in property," and defines "enterprise" to include a "corporation." 18 U.S.C. §§ 1961(3), (4). And, linguistically speaking, the employee and the corporation are different "persons," even where the employee is the corporation's sole owner. After all, incorporation's basic purpose is to create a

RESPONSE TO DEFENDANT SCOTT PAUL'S MOTION TO DISMISS AMENDED COMPLAINT – 7

distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs.

*Id*. (citation omitted).

Mr. Paul and the other Defendants cite *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 361 (9th Cir. 2005) in support of their argument that agents of a corporation and the corporation itself cannot combine to form a RICO enterprise. The language specifically relied upon by Defendants provides: "To be sure, if the 'enterprise' consisted only of DuPont and its employees, the pleading would fail for lack of distinctiveness." *Id. citing King*, 533 U.S. at 164, 121 S.Ct. at 2087. Despite the clarification of this language later in the *King* decision, Defendants and some courts appear to be confused as to what that language means. In *King*, the Supreme Court was referring to "earlier Second Circuit precedent concern[ing] a claim that a corporation was the 'person' and the corporation, <u>together with all its employees and agents</u>, were the 'enterprise.'" *King*, 533 U.S. at 164, 121 S.Ct. at 2087 (emphasis added) *citing Riverwoods Chappaqua Corp. v. Marine Midland Bank, N. A.*, 30 F.3d 339, 344 (2nd Cir. 1994). *Riverwoods Chappaqua Corp.* is a Second Circuit case where the <u>only</u> defendant was "Marine Midland Bank, N.A." 30 F.2d at 343 ("Appellants later discontinued the action against the individual defendants, leaving Marine Midland as the sole defendant in the case.")

Like ships passing in the night, JH Kelly and Defendants address two different situations:

- JH Kelly Argument = Company X is a RICO person who, along with <u>named</u> agents of Company X, comprise the RICO enterprise. *See King*, 533 U.S. at 163, 121 S.Ct. at 2091

- Defendants' Argument = Company X is a RICO person who, acting through its <u>unnamed</u> employees and agents, comprises the RICO enterprise. *See Riverwoods Chappaqua Corp*, 30 F.2d at 343.

The holding in *King* stands for the proposition that JH Kelly could not name Tianwei as the defendant and argue that it committed RICO violations. That is not what JH Kelly has done

here. Similar to *King*, JH Kelly named Tianwei, along with Messrs. Paul, Zhang, Liu, and Xia, alleging they combined to form a separate RICO enterprise. The RICO enterprise alleged by JH Kelly is therefore valid and Mr. Paul's Motion to Dismiss should be denied.

### 2. JH Kelly Has Sufficiently Pled Wire Fraud as a Predicate Act

Mr. Paul essentially repeats his argument that the Amended Complaint does not plead fraudulent conduct with particularity when challenging JH Kelly's wire fraud allegations as a predicate acts. Although allegations of wire fraud must comply with Rule 9(b), *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400-01 (9th Cir. 1986), the statute requires only "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with specific intent to defraud, and (3) the use of … interstate wire communications in furtherance of the scheme." *U.S. v. Inzunza*, 638 F.3d 1006, 1017 (9th Cir. 2011).

> To the degree that the first requirement – the formation of a scheme or artifice to defraud – requires a showing of the defendants' state of mind, general rather than particularized allegations are sufficient. Similarly, the third requirement – specific intent to deceive or defraud – requires only a showing of the defendants' state of mind, for which general allegations are sufficient. <u>The only aspects of wire fraud that require particularized allegations are the factual circumstances of the fraud itself</u>.

*Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) (emphasis added).

The Amended Complaint fulfills the criteria for alleging wire fraud as a predicate act. JH Kelly alleges that Defendants devised a scheme to interfere and undermine JH Kelly's original contract by improperly withholding payments and making threats to replace JH Kelly until JH Kelly agreed to new unfavorable terms, and then to use Tianwei's status as owner and purported creditor as a means of fraudulently inducing JH Kelly into continuing its work on the Project without payment while Tianwei used the funds owing and designated for payment to JH Kelly for other, improper purposes and/or to fraudulently induce JH Kelly into continuing its work on

the Project without payment knowing it would never pay JH Kelly at the agreed price. (Doc. 35, ¶¶ 61, 67). The Amended Complaint identifies the particular nature of the alleged wire fraud supporting the patterns of racketeering activity engaged in by Defendants, including Mr. Paul. (*Id*., ¶¶ 59-70). The predicate acts are stated with specificity, which allegations include the identity of the speaker, the date of the statement, a direct quote of the statement, a description of how the communication was made and to whom the communication was made. This information provides the who, what, when, where, and how of the alleged misconduct, states that the representations were transmitted by wires in interstate or foreign commerce, alleges that the representations were made with the specific intent to defraud or deceive, and complies with Rule 9(b).

The circumstances supporting JH Kelly's racketeering claims against Mr. Paul are stated with particularity and his Motion to Dismiss the Amended Complaint should therefore be denied.

   **C.**    <u>**JH Kelly Has Standing to Pursue its Fraud and RICO Claims**</u> [2]

When a Rule 12(b) motion to dismiss is based on lack of standing, the reviewing court must defer to the plaintiff's factual allegations, and further must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The doctrine of standing is based both on prudential concerns and on constitutional limitations on the jurisdiction of the federal courts." *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 (9th Cir. 2008). To determine whether a dispute presents a case or controversy sufficient for jurisdiction under Article III of the Constitution, courts apply a three-element test: (1) "the plaintiff must have suffered an 'injury in fact' – an

---

[2] Mr. Paul briefly challenges JH Kelly's standing based on Hoku Materials' status as a debtor in bankruptcy. JH Kelly previously addressed a similar argument raised by Tianwei. (Doc. 27, pp. 7-9). JH Kelly incorporates those points and arguments by this reference.

RESPONSE TO DEFENDANT SCOTT PAUL'S MOTION TO DISMISS AMENDED COMPLAINT – 10

invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) "there must be a causal connection between the injury and the conduct complained of," and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. (*quoting Lujan*, 504 U.S. at 560-61 (internal quotation marks omitted)).

"To have standing under civil RICO, [a plaintiff] is required to show that the racketeering activity was both a but-for cause and a proximate cause of his injury." *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 873 (9th Cir. 2010) (*citing Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). For RICO purposes, proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged." *See Holmes*, 503 U.S. at 268; *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiffs' injuries.").

The causation element of standing requires a plaintiff to show an injury that is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Gibson v. Credit Suisse AG*, 787 F.Supp.2d 1123, 1130 (D. Idaho 2011) (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

The significance of the change from the escrowed-payment arrangement to the lump sum arrangement forced upon JH Kelly by Defendants cannot be overstated. By no longer requiring Defendants to escrow funds for work to be performed, representations that the money was secured gained heightened importance; under the old system, such representations were unimportant because either the funds for work were escrowed or they were not.

Mr. Paul claims ignorance regarding the damages caused by his fraudulent communications. However, the Amended Complaint makes this very clear. Because of his and the other Defendants' fraudulent representations, JH Kelly continued working on the Project without payment. The representations about having the funding in place were especially important because Defendants had just pressured JH Kelly into a new arrangement that no longer required Defendants to escrow funds for work to be performed. Previously, JH Kelly knew whether there was sufficient funding in place. Under the new arrangement, JH Kelly had to depend upon Defendants' representations that the money was there to pay for its work. This is not a case where Defendants represented they thought they could get the money and eventually did not pay on a contract. Instead, this is a case where Defendants expressly represented they had the money and any delays were the result of bureaucratic red tape. These representations caused JH Kelly to incur damages that would not have been incurred but for Defendants' representations.

What Mr. Paul really appears to argue is that JH Kelly lacks standing because it has not pled the exact dollar figures of its alleged damages and/or has not attached specific invoices for specific tasks attributable to Mr. Paul's representations. In other words, Mr. Paul argues that JH Kelly is required to plead all support for its claims or it lacks standing. The holdings in *Iqbal* and *Twombly* do not go that far. This is not the stage of the litigation where JH Kelly is required to prove its damages. All that must be determined at this stage is whether JH Kelly has sufficiently pled damages that are plausible. JH Kelly has done this and Mr. Paul's standing argument fails.

## II. THE AMENDED COMPLAINT PLEADS A VALID NEGLIGENCE CLAIM

Defendants argue that the Amended Complaint fails to state a valid claim for negligence or negligent misrepresentation. As an initial matter, JH Kelly agrees that the Amended Complaint does not state a claim for negligent misrepresentation. JH Kelly has not attempted to state a claim for negligent misrepresentation. However, the fact that a claim for negligent misrepresentation may not be available does not preclude a claim for negligence. *Duffin v. Idaho Crop Improvement Assoc.*, 126 Idaho 1002, 895 P.2d 1195 (1995). Idaho law supports JH Kelly's negligence claim based on the "special relationship" exception to the economic loss rule.

The economic loss rule "prohibits recovery of purely economic losses in a negligence action" unless an exception applies, including (1) the existence of a special relationship between the parties, or (2) the existence of unique circumstances. *Blahd v. Richard B. Smith,* 141 Idaho 296, 300-02, 108 P.3d 996, 1000-02 (2005). Application of both exceptions depends on the equities of the case: "The term 'special relationship,' therefore, refers to those situations where the relationship between the parties is such that *it would be equitable to impose* a duty to "exercise due care to avoid purely economic loss." *Duffin,* 126 Idaho at 1008, 895 P.2d at 1201 (emphasis added); *Blahd,* 141 Idaho at 301, 108 P.3d at 1001 (*quoting Duffin*). Similarly, the "unique circumstances" exception involves the question of what is equitable, *i.e.,* how should the risk be fairly allocated among the parties: "Economic loss might . . . be recovered in tort where the occurrence of unique circumstances *requires a different allocation of the risk*." *Duffin*, 126 Idaho at 1007-08, 895 P.2d at 1200-01 (emphasis added); *Blahd,* 141 Idaho at 302, 108 P.3d at 1002 (*quoting Duffin*).

While JH Kelly acknowledges that the Idaho Supreme Court has stated that "there is an extremely limited group of cases where the law of negligence extends its protections to a party's

economic interest," *Duffin*, 126 Idaho at 1008, 895 P.2d at 1201, the equities and the facts of this case support application of the "special relationship" exception. JH Kelly should be allowed to present those equities and facts beyond the bare allegations of a complaint as challenged by the several Motions to Dismiss.

The "special relationship" exception applies where (a) "a professional or quasi-professional performs personal services," or (b) "an entity holds itself out to the public as having expertise regarding a specialized function and, by so doing, knowingly induces reliance on its performance of that function." *Blahd*, 141 Idaho at 301, 108 P.3d at 1001, *citing Duffin*, 126 Idaho at 1008, 895 P.2d at 1201. While the Idaho Supreme Court in *Blahd* referenced an "entity" holding itself out to the public as having expertise, *Duffin* did not limit the application of the special relationship exception exclusively to entities. Rather, it analyzed the relationship between the parties and whether a party held himself/itself out to the public as having expertise regarding a specialized function. *Duffin*, 126 Idaho at 1008, 895 P.2d at 1201, *citing McAlvain v. Gen. Ins. Co. of America*, 97 Idaho 777, 780, 554 P.2d 955, 958 (1976); *see also Nelson v. Anderson Lumber Co.*, 140 Idaho 702, 710, 99 P.3d 1092, 1100 (Ct. App. 2004) ("A special relationship may exist where *a party* holds itself out to the public as performing a specialized function and induces reliance on superior knowledge and skill.") (emphasis added).

JH Kelly alleges that Defendants held themselves out to "public officials of the State of Idaho, Bannock County, Idaho, and Pocatello, Idaho, to the business community and the general public of the Pocatello, Idaho metropolitan area, and to the hundreds of contractors, service providers and suppliers involved in developing and constructing the Project," as having expertise (i) "in developing specialized manufacturing facilities for solar energy products, including polysilicon manufacturing facilities," and (ii) "in obtaining the sizable amounts of financing

necessary for the construction and development of such facilities from quasi-governmental lenders and other financial institutions from the People's Republic of China." (Doc. 35, ¶ 72). JH Kelly further alleges that defendants "knowingly induced JH Kelly to rely on them in the performance of those specialized functions." (*Id.*, ¶ 73).

*Duffin* expressly holds that the "special relationship" exception is not limited exclusively to professional and quasi-professional relationships. Rather, where a party holds itself out as having expertise in the performance of a specialized function and induces reliance on the performance of that function, a "special relationship" exists. 126 Idaho at 1008, 895 P.2d at 1201. In *Duffin*, the Court held that the certification of seed potatoes as being free from disease was a specialized function. And because the Idaho Crop Improvement Association (ICIA) held itself out to the public as having expertise in the performance of that function, the ICIA occupied a special relationship with those whose reliance it knowingly induced.

In support of this holding, *Duffin* cited with approval the opinion of Hon. Benjamin Cardozo of the New York Court of Appeals in *Glanzer v. Shepard*, 135 N.E. 275 (N.W. 1922). In *Glanzer*, plaintiffs bought 905 bags of beans, which were to be paid for in accordance with weight sheets certified by the defendants, who were public weighers. The sellers of the beans requested the public weighers to make a return of the weight and furnish the buyers with a copy. The weight sheets certified by the public weighers overstated the weight of the beans and as a result the buyers overpaid. In concluding that the public weighers held a duty to the buyers, the Court stated:

> "The defendants held themselves out to the public as skilled and careful in their calling. They knew that the beans had been sold, and that on the faith of their certificate payment would be made. They sent a copy to the plaintiffs for the very purpose of inducing action. All of this they admit. In such circumstances, assumption of the task of weighing was the assumption of a duty to weigh carefully for the benefit of all whose conduct was to be governed."

RESPONSE TO DEFENDANT SCOTT PAUL'S MOTION TO DISMISS AMENDED COMPLAINT – 15

135 N.E. at 275-76.

Thus, the Idaho Supreme Court has held that certifying seed potatoes as disease free is one sort of "specialized function" that can give rise to a "special relationship." And based on its citation of *Glanzer* in support of that holding, one can infer that the Court would have concluded that public weighers also performed a "specialized function."

In *Millenkamp v. Davis Co. Foods International, Inc.*, 391 F.Supp.2d 872 (D. Idaho 2005), this Court concluded that the "special relationship" exception did not apply as to a defendant engaged in the manufacture and sale of cattle feed. The Court stated that the exception did not apply because no evidence was presented establishing that the defendant represented its expertise to the public, or knowingly induced reliance on its performance because of such expertise. However, the Court stated that "*the manufacture and sale of cattle feed could be considered a specialized function*." 391 F. Supp.2d at 879 (emphasis added).

Likewise, in *Gen. Fire & Cas. Co. and G.F.&C. Holding Co. v. Guy Carpenter & Co., Inc.*, No. CV 05-251-S-LMB, 2006 WL 3239365 (D. Idaho Nov. 7, 2006), this Court held, in the context of competing motions for summary judgment, that the "special relationship" exception could apply as between a reinsurance intermediary and the parent of its client. The defendant reinsurance intermediary acted as a middle man between primary company insurers and reinsurers. The defendant asserted that its only relationship was with its client, a primary company insurer. The defendant asserted that it provided no services to, and that it had no relationship whatsoever with, the parent company of its client. However, the Court noted that the defendant's marketing materials stated that "[e]ffective reinsurance may add value to an *insurance enterprise*." 2006 WL at *5 (emphasis in original). The Court held that "[b]ased on that and due to the parent and primary company's close relationship, a reasonable jury could

RESPONSE TO DEFENDANT SCOTT PAUL'S MOTION TO DISMISS AMENDED COMPLAINT – 16

conclude that [the intermediary] engaged in a marketing campaign to induce reliance not only by direct purchasers of the reinsurance, but also by those within an 'insurance enterprise.'" *Id*.

In *Mountain View Hospital, LLC v. Sahara, Inc.*, No. CV 07-464-BLW, 2011 WL 4962183 (D. Idaho Oct. 17, 2011), this Court ruled, in the context of competing motions for summary judgment, that the "special relationship" exception did not apply in an action against a general contractor engaged to design and build a hospital. In that case, the plaintiff argued that the general contractor should be characterized as a professional, which would implicate the first prong of the "special relationship" exception—where a professional or quasi-professional performs services. It does not appear from the opinion that the plaintiff relied on the second prong of the exception—that the defendant held itself out to the public as having expertise in a specialized function, as in *Duffin*. This Court also noted in *Mountain View* that the plaintiff did not rely on the defendant's expertise to make "one fateful decision." 2011 WL at *15. Rather, the parties had entered into a detailed contractual relationship for design and construction services.

The facts of this case are very different. Here, JH Kelly was the contractor. JH Kelly obviously did not rely on the Defendants to construct a building per the terms of a contract. JH Kelly did not have any contract with the Defendants. In this case, JH Kelly relied on Defendants' stated expertise in developing solar energy manufacturing facilities, and their stated expertise in obtaining financing through their connections with Chinese lenders, such that the project would be fully funded and completed. Defendants knowingly induced that reliance, causing JH Kelly to make "the fateful decision" to continue working on the project—and be left holding the bag for some $25 million.

Defendants essentially ask this Court to conclude, as a matter of law, that neither (i) "developing specialized manufacturing facilities for solar energy products, including polysilicon manufacturing facilities," nor (ii) "obtaining sizeable amounts of financing necessary for the construction and development of such facilities from quasi-governmental lenders and other financial institutions from the People's Republic of China," could under any circumstances qualify as a "specialized function" for purposes of the "special relationship" exception. That is to say that certifying seeds, certifying the weight of harvested beans, manufacturing and selling cattle feed, and adding value to an insurance enterprise are all specialized functions, whereas developing and financing a solar energy manufacturing facility are not. In addition, Defendants ask the Court to make this determination at the stage of motions to dismiss, based solely on the allegations of a complaint without reviewing any of the evidence supporting the allegations—unlike *Duffin*, *Millenkamp*, *Gen. Fire* and *Mountain View Hospital*, which were all decided on motions for summary judgment. In fact, every one of the "special relationship" cases cited by Defendants was decided on summary judgment, where the Court had the benefit of assessing the evidence presented to decide if there was a triable issue. Defendants have not cited, and JH Kelly has not found, a single case alleging a "special relationship" under *Duffin* that was dismissed on a Rule 12 motion.

JH Kelly's Amended Complaint states a valid claim for negligence based on the "special relationship" exception to the economic loss rule. Mr. Paul's Motion to Dismiss the negligence claim should be denied.

### III. THIS COURT HAS PERSONAL JURISDICTION OVER MR. PAUL

Mr. Paul simply incorporates the points and arguments raised in both his and Messrs. Zhang's and Liu's prior motions to dismiss. Given that Mr. Paul raises no new arguments, and in

the interests of brevity, JH Kelly respectfully refers this Court to JH Kelly's prior points and arguments in opposition to those personal jurisdiction challenges, and incorporates those points and arguments into this responsive brief by this reference. (*See* Doc. 19, pp. 11-14; Doc. 21, pp. 2-7).

## **CONCLUSION**

JH Kelly's claims for fraud and racketeering are pled with particularity. Moreover, the Amended Complaint states a valid negligence claim based on the "special relationship" exception to the economic loss rule. Mr. Paul's Motion to Dismiss should be denied in its entirety.

DATED this  16th  day of June, 2014.

                                      ELAM & BURKE, P.A.

                                      By:        /s/ Joseph N. Pirtle
                                                   Joseph N. Pirtle, of the firm
                                                   Attorneys for JH Kelly, LLC

CERTIFICATE OF SERVICE

  I HEREBY CERTIFY that on the __16th__ day of June, 2014, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Celeste K Miller
ck@mcdevitt-miller.com, heather@mcdevitt-miller.com

Dwight A Healy
dhealy@whitecase.com

Gayle Argon
gayle.argon@whitecase.com

Howard Holderness
hholderness@morganlewis.com, cgreenblatt@morganlewis.com

Jack S. Gjording
jgjording@gfidaholaw.com, cfouser@gfidaholaw.com, jhall@gfidaholaw.com, jsmith@gfidaholaw.com, ktonkin@gfidaholaw.com, lloyd@gfidaholaw.com

Kelly Alfred Cameron
kcameron@perkinscoie.com, docketboi@perkinscoie.com, shellylee@perkinscoie.com

Michael O Roe
mor@moffatt.com, ccb@moffatt.com, ecf@moffatt.com, mjm@moffatt.com, moffattthomas@hotmail.com, tmh@moffatt.com

Stephen C. Hardesty
shardesty@perkinscoie.com, lstacy@perkinscoie.com

              /s/ Joseph N. Pirtle
              Joseph N. Pirtle

4837-6760-3739, v. 1

RESPONSE TO DEFENDANT SCOTT PAUL'S MOTION TO DISMISS AMENDED COMPLAINT – 20